SHEMMAN v AMERICAN STEAMSHIP COMPANY

Docket No. 77-2239. Submitted January 16, 1979, at Detroit.—Decided April 5, 1979. Leave to appeal applied for.

REFERENCES FOR POINTS IN HEADNOTES

[1] 32 Am Jur 2d, Federal Employers' Liability and Compensation Acts §§ 39, 40, 73.

[2] 32 Am Jur 2d, Federal Employers' Liability and Compensation Acts § 71.

Applicability of state practice and procedure in Federal Employers' Liability Act actions brought in state courts. 79 ALR2d 553.

[3-7] 32 Am Jur 2d, Federal Employers' Liability and Compensation Acts §§ 51, 53.

70 Am Jur 2d, Shipping §§ 412-414.

[5-7] 32 Am Jur 2d, Federal Employers' Liability and Compensation Acts § 52.

70 Am Jur 2d, Shipping § 530.

Shipowner's liability for injury or death of seaman resulting from failure to furnish him adequate assistance for work on or connected with vessel—Federal cases. 18 L Ed 2d 1497.

[8] 75 Am Jur 2d, Trial §§ 193, 194, 274, 307-314.

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L Ed 2d 886.

Prejudicial effect of argument or remark that adversary was attempting to suppress facts. 29 ALR2d 996.

Prejudicial effect, in argument or summation in civil case, of attacks upon opposing counsel. 96 ALR2d 9.

[9] 75 Am Jur 2d, Trial § 306.

[10] 29 Am Jur 2d, Evidence §§ 251-254, 309.

30 Am Jur 2d, Evidence § 1121.

32 Am Jur 2d, Federal Employers' Liability and Compensation Acts § 54.

[11] 29 Am Jur 2d, Evidence § 661.

[12] 30 Am Jur 2d, Evidence §§ 927, 930, 931, 933, 945, 950.

What constitutes books of original entry within rule as to admissibility of books of account. 17 ALR2d 235.

Verification and authentication of slips, tickets, bills, invoices, etc., made in regular course of business, under the Uniform Business Records as Evidence Act, or under similar "Models Acts." 21 ALR2d 773.

[13, 15] 29 Am Jur 2d, Evidence §§ 251-256.

[14, 15] 75 Am Jur 2d, Trial § 651.

Ahmed S. Shemman brought an action for damages for personal injuries against American Steamship Company in Wayne Circuit Court. The injuries were allegedly sustained by plaintiff while he was performing his duties as a fireman aboard a coal-fired steamer owned by the defendant. Judgment for plaintiff, John H. Hausner, J. The defendant appeals alleging: 1) that there was insufficient evidence to submit the issue of negligence to the jury, 2) that the issue of the seaworthiness of the vessel was improperly submitted to the jury, 3) that reversal is mandated because the conduct of the plaintiff's attorney was inflammatory and prejudicial, 4) that the trial court erred in denying the defendant the opportunity to present evidence of the plaintiff's physical condition at the time he left the ship as well as evidence of subsequent alleged malpractice, 5) that the trial court improperly refused to admit a time card signed by the plaintiff indicating that he had worked his regular watch plus an hour of overtime on the day of the alleged injury, 6) that the trial court improperly instructed the jury that adverse inferences could be drawn from the defendant's failure to record in the engine room log the event of plaintiff's injury, from the defendant's failure to produce records concerning the coal purchased for use aboard the vessel and from the defendant's failure to produce, at trial, a film taken by the defendant's investigator, and 7) that the trial court erred in refusing to instruct the jury that it should disregard inflation in making any award for loss of future earnings.

The plaintiff cross-appeals, alleging that interest should have been awarded from the date of the filing of the complaint rather than from the date of judgment. *Held:*

1. The Federal act covering actions for damages for personal injuries by seamen against shipowners (Jones Act) requires only the slightest negligence on the part of a shipowner for a finding of liability. In addition, in actions based on the Jones Act, the burden of proof on a plaintiff to prove proximate cause is very light. Applying these standards, the plaintiff produced sufficient evidence to go to the jury on the issue of negligence.

2. The plaintiff's allegation that the defendant failed to give

[15, 16] 75 Am Jur 2d, Trial § 767.
[16] 29 Am Jur 2d, Evidence § 801.
  75 Am Jur 2d, Trial § 769.
  Use of motion pictures as evidence. 62 ALR2d 686.
[17] 32 Am Jur 2d, Federal Employers' Liability and Compensation Acts § 75.
[18] 45 Am Jur 2d, Interest and Usury §§ 96-98.
  Date of verdict or date of entry of judgment thereon as beginning of interest period on judgment. 1 ALR2d 479.

adequate training to the plaintiff for his duties and the evidence introduced were sufficient to send the issue of unseaworthiness to the jury. In determining the seaworthiness of a vessel, there is no reason to distinguish between a shipowner's failure to provide a seaman with adequate gear or adequate shipmates and failure to provide him with adequate training for the job at hand.

3. The plaintiff's attorney did engage repeatedly in improper arguments and innuendos and the cumulative effect was so highly prejudicial to the defendant as to deny the defendant a fair trial. The proper remedy is to remand for a new trial.

4. The defendant's attempts to present evidence of the plaintiff's condition at the time he left the ship as well as evidence of alleged subsequent medical malpractice were an effort to support the defendant's contention that the plaintiff's disk pathology was not caused by his injury aboard the ship but was the result of medical malpractice and to show that the medical malpractice was not causally related to the original injury. The trial judge erred in refusing to admit this evidence.

5. The trial court's determination that the circumstances surrounding the plaintiff's signing of the time card prevented the time card from being admissible as an adoptive admission will not be disturbed. However, the time card was independently admissible as a business record and was highly relevant. The trial court abused its discretion in refusing to admit the time card into evidence.

6. The trial court's instruction indicating that an adverse inference could be drawn from the defendant's failure to record in the engine room log the event of the plaintiff's injury was error because there was no proof supporting the instruction.

7. The amount or type of coal involved was irrelevant to the issue of liability. Giving an adverse inference instruction based on the defendant's failure to produce records when the records were of no relevance was prejudicial to the defendant.

8. It was error for the trial court to give an adverse inference instruction concerning the defendant's failure to develop the film because, given the date and time of day that the film was taken, the defendant's contention that there was insufficient lighting to make developing the film worthwhile was reasonable.

9. In cases such as the present case the entire proceeding, including the measure of damages, is governed by principles of maritime law. Accordingly, the damages must be reduced to present value, as the trial court instructed in this case. The

trial court did not err in refusing to give the instruction requested by the defendant that inflation be disregarded in measuring damages.

10. The Jones Act incorporates the Federal Employers' Liability Act. The allowance of interest on such a judgment is a matter of Federal substantive law. The trial court was correct in denying prejudgment interest.

Reversed and remanded for a new trial.

1. Seamen — Shipowners — Negligence — Contributory Negligence — Assumption of Risk — Federal Statutes.

Even the slightest negligence on the part of a shipowner suffices under a Federal statute for a finding of liability for personal injuries suffered by a seaman; if such negligence is found, neither contributory negligence nor assumption of risk will defeat a seaman's claim (46 USC 688).

2. Seamen — Shipowners — Negligence — Proximate Cause — Burden of Proof — Federal Statutes.

The burden of proof on a seaman-plaintiff in an action brought under a Federal statute, for personal injuries sustained as a result of the negligence of a shipowner-defendant, to prove proximate cause is very light, even featherweight; the test in a jury case is whether the proofs justify with reason the conclusion that the shipowner's negligence played any part, even the slightest, in producing the injury for which damages are sought (46 USC 688).

3. Negligence — Seamen — Shipowners — Seaworthiness.

A shipowner has an absolute duty to furnish a seaworthy ship; he is not required to provide an accident-free ship, but must furnish a vessel and appurtenances reasonably fit for their intended use.

4. Negligence — Seamen — Shipowners — Seaworthiness.

No liability for the unseaworthiness of a ship can exist where there is no defective condition of the equipment, appurtenances, crew, cargo or gear of the ship.

5. Negligence — Seamen — Shipowners — Seaworthiness — Ship's Crew — Machines.

There should be no distinction between men and machines in determining whether a vessel is either insufficiently or defectively equipped; the failure to provide an adequate crew may render a vessel unseaworthy; an inadequate crew may be due either to insufficient manning or an incompetent crew.

6. Negligence — Seamen — Shipowners — Seaworthiness — Inexperienced Crew — Proper Supervision.

The inexperience of a ship's crew member does not necessarily create an unseaworthy condition on a ship; properly supervised, an inexperienced, untrained individual may learn to become competent.

7. Seamen — Negligence — Shipowners — Seaworthiness — Inadequate Training.

The rationale behind the unseaworthiness doctrine is to protect seamen from dangerous conditions beyond their control; therefore, there is no reason to distinguish between a shipowner's failure to provide a seaman with adequate gear or adequate shipmates and failure to provide the seaman with adequate training for the job at hand, as the same risks are created by all three.

8. Trial — Fair Trial — Attorney Misconduct.

A party defending against a lawsuit has been denied a fair trial where counsel for the plaintiff 1) interjected irrelevant, prejudicial material throughout the trial in an obvious attempt to divert the jury from the merits of the case, 2) engaged in unwarranted attacks upon the defendant, its attorneys and its witnesses, accusing some of the defendant's witnesses of lying and of concocting stories, without any basis, and implying that defendant's counsel had suborned perjury, and 3) was involved in a highly questionable meeting with one of the defense witnesses on the day before trial.

9. Trial — Attorney Misconduct — Credibility of Client — Code of Professional Responsibility — Disciplinary Rules.

It is improper for an attorney, during the course of a trial, personally to vouch for his client's credibility; such conduct is prohibited by the Code of Professional Responsibility (DR 7-106[C][4]).

10. Evidence — Seamen — Negligence — Medical Malpractice — Causal Connection to Injury.

It was improper for a trial judge to refuse to allow a defendant to introduce evidence of a plaintiff's condition shortly after the plaintiff suffered an injury aboard the defendant's ship and to refuse to allow introduction of alleged subsequent medical malpractice where it was the defendant's position that there was no causal connection between the back strain suffered by the plaintiff on the ship and the disk pathology for which he was operated upon.

11. EVIDENCE — ADMISSIONS — ADOPTIVE ADMISSIONS.

An adoptive admission is the express adoption of another's statement as one's own on the part of a party which manifests circumstantially that party's assent in the truth of a statement made by another. .

12. EVIDENCE — HEARSAY — EXCEPTIONS — BUSINESS RECORDS — STATUTES.

An employee's time card may be admissible as evidence under the business record exception to the hearsay rule (MCL 600.2146; MSA 27A.2146).

13. EVIDENCE — RELEVANCE — TRIAL — DISCRETION.

The determination of the relevance of evidence is within the sound discretion of the trial court.

14. TRIAL — JUDGES — INSTRUCTIONS TO JURY — INSTRUCTIONS WITHOUT EVIDENTIARY SUPPORT.

It is reversible error for a trial court to give an instruction unsupported by the proofs.

15. TRIAL — JUDGES — INSTRUCTIONS TO JURY — INFERENCES — FAILURE TO PRODUCE RECORDS — EVIDENCE — RELEVANCE.

An instruction to a jury informing them that they could draw an adverse inference from a defendant-shipowner's failure to produce records concerning the amount and type of coal purchased for use aboard the defendant's vessel was an improper instruction where those records were of no relevance to the issues.

16. TRIAL — INSTRUCTIONS TO JURY — INFERENCES — EVIDENCE — FAILURE TO PRODUCE.

An instruction to a jury that they could draw an inference adverse to a defendant from the defendant's failure to produce at trial a film taken by the defendant's investigator was improper where 1) the investigator testified that he filmed the plaintiff walking without crutches at a specific time, using only a cane, 2) the investigator testified that he discarded the film without developing it because of the poor lighting conditions during the filming, 3) when plaintiff testified in rebuttal, he admitted using only a cane on that day, 4) the doctor who the plaintiff went to see that day confirmed that plaintiff was using a cane, and 5) in view of the date and time of day at which the film was taken it was completely reasonable that there was insufficient lighting to make developing of the film worthwhile.

17. NEGLIGENCE — SEAMEN — SHIPOWNERS — DAMAGES — MARITIME
LAW — PRESENT VALUE.

The entire proceedings, including the measure of damages, in an
action against a defendant-shipowner for injuries caused to a
plaintiff while working aboard a vessel owned by the defendant
are governed by principles of maritime law; therefore, in such
an action, damages must be reduced to present value and
instructions along those lines are proper.

18. DAMAGES — INTEREST — SEAMEN — SHIPOWNERS — FEDERAL
LAW.

The allowance of interest on a judgment against a shipowner for
damages for personal injuries suffered by a seaman while
aboard ship is a matter of Federal substantive law; such
interest is awarded from the date of judgment, not from the
date of the filing of the complaint.

*Leonard C. Jaques, P.C.,* for plaintiff.

*Fred H. Keidan,* and *Cadwalader, Wickersham &
Taft* (by *John A. Sullivan),* for defendant.

Before: D. C. RILEY, P.J., and J. H. GILLIS and
MACKENZIE, JJ.

J. H. GILLIS, J. Plaintiff brought suit for injuries
allegedly sustained while he was performing his
duties aboard the coal-fired steamer, Harris N.
Snyder. From a jury verdict in favor of plaintiff for
$750,000, defendant appeals.

Plaintiff was employed as a fireman. His duties
included cleaning the grates upon which the coal
burned. The grates on the Snyder were movable. A
3 to 4 foot metal bar was inserted into the front of
the grate mechanism which released a catch, al-
lowing the grates to drop and dump the ash into a
pit. The lever would then be pulled back, raising
the grates until they locked shut.

As part of the cleaning procedure, it was often
necessary to break up clinkers. A clinker is a solid

mass of noncombustible material left over after coal has burned. Plaintiff was provided with a number of tools to assist him in breaking up clinkers and cleaning the grates.

Plaintiff testified that on September 4, 1973, he was on the midnight to 4 a.m. watch. He was pulling the lever to close the grates when a clinker jammed them. He then pulled harder and upon doing so experienced a pain in his back.

It is disputed whether plaintiff finished his watch. In any event, he was subsequently taken ashore and given medical treatment. He has not worked since and it is agreed that he is currently unfit for duty as a seaman.

Defendant raises a number of issues for our consideration. We address, *seriatim,* those issues meriting discussion.

## I. Negligence

Defendant first contends that there was insufficient evidence to submit the issue of negligence to the jury.

Plaintiff brought suit alleging liability under both the Jones Act, 46 USC 688, and on principles of unseaworthiness. The Jones Act provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railroad employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for

death in the case of railway employees shall be applicable." 46 USC 688.

Under this act, even the slightest negligence on the part of the shipowner suffices for a finding of liability. If such negligence is found, neither contributory negligence nor assumption of risk will defeat a seaman's claim. *Spinks v Chevron Oil Co,* 507 F2d 216, 223 (CA 5, 1975). In addition, the burden of proof on the plaintiff to prove proximate cause in actions based upon the Jones Act is very light, even "featherweight". *Davis v Hill Engineering Inc,* 549 F2d 314, 329 (CA 5, 1977), *Landry v Two R Drilling Co,* 511 F2d 138 (CA 5, 1975). The test of a jury case is whether the proofs justify with reason the conclusion that the shipowner's negligence played any part, even the slightest, in producing the injury for which damages are sought. *Varveris v United States Lines Co,* 249 F2d 89 (CA 2, 1957).

Plaintiff contended that defendant was negligent in purchasing poor quality coal which was more likely to form clinkers and that plaintiff was not given adequate training in the proper procedure for dealing with such clinkers.

Plaintiff produced sufficient evidence to go to the jury on the issue of negligence. While plaintiff had worked as a fireman for a number of years, he had always worked on ships with stationary grates. During plaintiff's first watch defendant had the preceding fireman stay over 2 hours and the succeeding fireman come on duty 2 hours early to show plaintiff what to do. However, a jury could reasonably infer from the evidence that plaintiff was not given adequate instruction on the proper procedure for using the dump grate mechanism when numerous clinkers formed. Hence, the issue of negligence was properly put to the jury.

## II. Seaworthiness

The issue of seaworthiness is entirely distinct from Jones Act liability. The shipowner has an absolute duty to furnish a seaworthy ship. He is not required to provide an accident-free ship, but must furnish a vessel and appurtenances reasonably fit for their intended use. *Mitchell v Trawler Racer, Inc,* 362 US 539; 80 S Ct 926; 4 L Ed 2d 941 (1960). Where there is no defective condition of the equipment, appurtenances, crew, cargo, or gear of the ship no liability for unseaworthiness can exist. *Earles v Union Barge Line Corp,* 486 F2d 1097, 1103 (CA 3, 1973).

In the instant case the unseaworthiness claim appears to be based upon the same allegations as the negligence claim; that the shipowner failed to provide adequate training on the proper method for removal of heavy clinkers.

A classic case of unseaworthiness exists when the vessel is either insufficiently or defectively equipped. In addition, the United States Supreme Court has held that there should be no distinction between men and machines. Hence, failure to provide an adequate crew may also render a vessel unseaworthy. *Waldren v Moore-McCormick Lines, Inc,* 386 US 724; 87 S Ct 1410; 18 L Ed 2d 482 (1967), *Anderson v Great Lakes Dredge & Dock Co,* 509 F2d 1119 (CA 2, 1974). An inadequate crew may be due either to insufficient manning or an incompetent crew. *Orient Mid-East Lines, Inc v A Shipment of Rice,* 496 F2d 1032 (CA 5, 1974).

In *Orient, supra,* the Court stated that the inexperience of a crew member does not necessarily create an unseaworthy condition. Properly supervised, an inexperienced untrained individual may learn to become competent. *Id.,* at 1040.

We conclude that the allegation that defendant failed to give adequate training to plaintiff in the use of the grate mechanism when dealing with large clinkers and the evidence introduced were sufficient to send the issue of unseaworthiness to the jury. The rationale behind the doctrine of seaworthiness is to protect seamen from dangerous conditions beyond their control. *Waldren, supra.* We see no reason to distinguish between a shipowner's failure to provide a seaman with adequate gear or adequate shipmates and failure to provide him with adequate training for the job at hand. The same risks are created by all three.

### III. Prejudicial conduct

Defendant contends that the conduct of plaintiff's attorney was so inflammatory and prejudicial that reversal is mandated. Upon an extensive review of the record we conclude that defendant is correct and a new trial is required.

In *Wayne County Board of Road Comm'rs v GLS LeasCo,* 394 Mich 126; 229 NW2d 797 (1975), the Supreme Court held that the defendant in that case was denied a fair trial due to the actions of the board's attorney. His conduct consisted of repeatedly belittling LeasCo's witnesses and lawyer by innuendo and unfounded accusations in an attempt to prejudice the jury.

In *Kern v St Luke's Hospital Ass'n of Saginaw,* 404 Mich 339; 273 NW2d 75 (1978), the Court held that plaintiff was deprived of a fair trial when defense counsel injected improper innuendos of a conspiracy between plaintiff's counsel and expert witnesses. The Court there found a "studied purpose to prejudice the jury and divert the jurors' attention from the merits of the case". *Id.,* at 354.

While the following quotation is taken from a criminal case involving prosecutorial misconduct, we believe it reflects what our review of the record has disclosed:

> " 'It is sometimes said that error "crept" into the trial of a lawsuit. Not so in the case at bar. It marched in like an army, with banners, and trumpets. It was escorted, and emphasized, and aggravated by the attorney for the State.' " *People v Brocato,* 17 Mich App 277; 169 NW2d 483 (1969), quoting from *State v Tolson,* 248 Iowa 733; 82 NW2d 105 (1957).

From his opening statement and throughout the entire trial, plaintiff's counsel injected irrelevant, prejudicial material in an obvious attempt to divert the jury from the merits of the case. He also engaged in unwarranted attacks upon defendant, its attorneys, and its witnesses. He accused some of the defense witnesses of lying and "concocting" stories without any basis and implied that defense counsel had suborned perjury. Plaintiff's counsel was also involved in a highly questionable meeting with one of the defense witnesses on the day before trial.

We do not think it is necessary for us to detail every impropriety contained in the record. However, we note the following items to demonstrate the wide range of this prejudicial conduct.

Perhaps the most blatant example of the injection of irrelevant, prejudicial material came during plaintiff's closing argument when he stated:

> "You know, you keep reading in the paper PBB. You know all about that, don't you? You see that in the paper all the time. You know, if you used a system, and you turned over that feeding situation in the Department of Agriculture to this ship owner, do you know what they would do? They would put that feed on the

market, and see whether or not those cows died before they would make a determination whether or not that feed was bad feed, and poisonous, because they are saying, in effect, we don't know, and there is no way for us to know, how that coal is just by looking at it by our naked eye, and you can't tell whether or not that PBB is in that feed by the naked eye. You know that too. Now, we are going to have to wait until we consume it so that we can find out whether or not it is any good. Now, what good is that? How are you going to protect the lives of anybody by waiting until it is consumed?"

PBB had absolutely no relevance to any issue in the case. This argument was extremely prejudicial and was obviously designed for the sole purpose of inflaming the jury.

Moreover, plaintiff's attorney did not restrict himself to local matters such as the PBB controversy. He also managed to mention the involvement of attorneys in the Watergate scandal in an attempt to discredit Mr. Parker, one of the defense attorneys.

Plaintiff's counsel also repeatedly belittled the defense witnesses and openly accused one defense witness of fabricating testimony:

"*Q* Captain, did you concoct this story? Did you and somebody—who put you up to saying this?
"*Mr. Busch:* Objection, Your Honor.
"*Q* Who put you up to saying this?
"*Mr. Busch:* Objection, Your Honor.

\* \* \*

"*Q* I am asking you then, who put you up to coming in here and concocting a story about a ventilator. Now, who put you up to that?
"*A* Nobody did."

In *Wayne County Board of Road Comm'rs, supra,* at 134, the Court stated:

"These comments represent more than the mere reproof of recalcitrant witnesses. They constitute unjustified, direct attacks on the integrity and honesty of LeasCo's witnesses. There is no evidence that these witnesses testified falsely, withheld information when stating that they did not know the answer to counsel's questions, or manufactured false evidence.

"Witnesses should not be subjected to personal attacks and unsubstantiated insinuations. Each party is entitled to present its case on the merits, free from remarks of opposing counsel which may prejudice the jury and divert its attention from the real issues."

Plaintiff's counsel did just what the Court in the above case condemned. He also tried to prejudice the jury by making repeated references to the defendant as a big corporation, interested only in profits and willing to devote "millions for defense, but not one cent for tribute".

Plaintiff's counsel attempted to prejudice the jury by referring to the fact that defendant was represented by a 130-member Wall Street law firm and implied that they were willing to suborn perjury in order to win the case.[1]

In this same vein, appeals were made to the jury

---

[1] "*Mr. Jaques* [plaintiff's counsel]: They even did what is very much unorthodox, and we know the circumstances surrounding it. They had a meeting in New York and it is one of those things like a command decision was made, say, okay, may day, may day. What are we going to do? Well, let's bring Parker in and let's get Parker to come in and to testify in behalf of the ship owner, well, recognizing that this is so unorthodox that the Bar Association frowns upon it. It shouldn't be. And he recognizes. Mr. Parker himself said, 'Yes, I am aware of such Canons of Ethics. I am aware of the Bar Association.' He said I know something about it. He said, 'I don't know much about it, but I know something.' You remember that? He said he knew something about that. A real springer. A real—you know—you know what he was. Now, here is a great outfit. You know, you have to look at motives. You know people—I guess it is a competitive world. No doubt it is, but here is a fairly young fellow, moved up, born in Georgia, moved on up up there in New York and he is with a great big firm, 130 lawyers Cadwalader, Wickersham & Taft. And they are all dead. He said, yes, they are all dead, all those fellows but that law firm, a Wall Street Law Firm, you take a look and you won't see his name on

to the effect that the defense attorneys were a bunch of New York lawyers trying to pull the wool over the eyes of midwestern folks.[2] Defense counsel was accused of "trickery" and the defense was characterized as "bogus" and "ludicrous".

Finally, we note that plaintiff's counsel personally vouched for his client's credibility:

"You know about his character, his veracity character. You know this fellow. You know, he has been on the stand a long time, but you saw him. I tried to, really—one thing about it—believe me, you know, nobody in this world wants anybody around him, certainly I don't, who is feining [sic], who is faking or anything like that, *and if there was one ounce of fake in that man, I wouldn't be here representing him. Well, there isn't.*" (Emphasis supplied.)

Such an assertion is completely improper and is

there, but you will see on this letterhead, you are going to see the big boys, one of whom is John Sullivan, and that's his boss; the command decision made, okay, let's bring him in and the idea, let's get him—

"*Mr. Busch:* Objection, Your Honor. Beyond the scope of the evidence.

"*The Court:* Overruled.

"*Mr. Jaques:* And so, what they do, they bring him in and they bring in this man, they say, now you get up there and you testify. Now, I feel badly because, you know, all lawyers, we are brothers, all lawyers. Now, what he testified to we know can't be true. There is no way it can be true."

[2] "When he came back in here, he came back in here as a coached witness, but how in the world do they think they can pull the wool over your eyes when he had already indicated that in no way could this—in no way did he have any information pertaining to some ventilator or blower is beyond me. They've got to think that you are not very bright people in order to bring something like that before you. Maybe they think us mid-western folks aren't bright. I don't know. I don't know what they think.

\* \* \*

"And they can go back to New York and tell them anything they want to. That New York outfit, those New York attorneys, they can go back and tell them that we are not that green in the midwest and we are not that kind of person where wool can be pulled over our eyes in such a tactical way."

prohibited by the Code of Professional Responsibility, DR 7-106(C)(4).

The cumulative effect of the improper arguments and innuendos made by plaintiff's counsel was so highly prejudicial that we conclude defendant was denied a fair trial. The proper remedy is to remand for a new trial. *Wayne County Board of Road Comm'rs, supra, Kern, supra.*

## IV. Evidence of plaintiff's physical condition and subsequent medical treatment

Defendant contends the trial court erred in denying the defendant the opportunity to present evidence of plaintiff's physical condition at the time he left the ship as well as evidence of subsequent alleged malpractice.

Defendant sought to introduce evidence to show that plaintiff suffered only a back strain on board the ship and that any disk pathology was specifically ruled out when plaintiff was examined shortly after the injury occurred. Plaintiff was operated upon in January, 1974, for a disk problem and following this operation developed drop foot. It was defendant's position that there was no causal connection between plaintiff's injury on the ship and the disk pathology for which he was operated upon.

The trial court excluded all such evidence relying upon *Stahl v Southern Michigan R Co,* 211 Mich 350, 355; 178 NW 710 (1920). That case held that where a person receives an injury through the negligent act of another, and the injury is afterward aggravated by an accident not the result of the victim's own negligence, he may recover for the entire injury sustained, as the law regards the probability of such aggravation as a consequent

and material result likely to flow from the original injury. While this is a correct statement of the law, it does not necessarily require the exclusion of the proffered evidence in the instant case. Plaintiff presented evidence that the injury could have produced the disk pathology for which plaintiff was operated upon. Thus the jury could reasonably conclude that any malpractice at that time was merely an aggravation of the initial injury. Under *Stahl, supra,* defendant would then be liable for plaintiff's entire injuries.

On the other hand, from the evidence defendant sought to introduce, the jury could conclude that the injury had not caused any disk pathology and that the alleged malpractice was not causally related to the original injury. In other words, it was defendant's contention that there was a break in the chain of causation.

We conclude the trial judge erred in refusing to admit this evidence. The jury could have been adequately instructed upon the applicable law. See *McAuliff v Gabriel,* 34 Mich App 344; 191 NW2d 128 (1971).

### V. Exclusion of time and wage records

Plaintiff testified that he was injured less than halfway through his four-hour watch and that he was unable to complete the watch. Defendant sought to introduce a time card signed by plaintiff indicating he had worked his regular watch plus an hour of overtime on the day of the alleged injury.

Defendant attempted to introduce the card as an admission and as a business record. The trial court refused to admit it because it was not sure plaintiff had read or could understand what he had signed.

In *Durbin v K-K-M Corp,* 54 Mich App 38; 220 NW2d 110 (1974), the Court indicated that merely signing a document is insufficient to find an admission. Rather, the circumstances must be examined to determine whether there was adoptive approval of the other's statement.

"An adoptive admission is the express adoption of another's statement as one's own. It is conduct on the *part of a party* which manifests circumstantially that party's assent in the truth of a statement made by another. The mere fact that a party had declared that he or another person made the statement is not in and of itself sufficient for a finding of adoption. In order to find adoptive approval of the other's statement the circumstances surrounding the other's declaration must be examined. McCormick (2d ed), § 269, p 649. Mrs. Childs stated that she signed the statement only at the request of her husband. The circumstances do not suffice for a finding of an adoptive admission and, moreover, in the normal course of affairs, adoptive admissions refer only to party-opponents." *Id.,* at 50.

In the instant case the trial court examined the circumstances surrounding plaintiff's signing of the card and determined that there was an insufficient basis for concluding that it was an adoptive admission. We will not disturb the court's ruling on that point.

However, we conclude the evidence was independently admissible as a business record. MCL 600.2146; MSA 27A.2146 provides in part:

"Any writing or record whether in the form of an entry in a book or otherwise, made as a memorandum of any act, transaction, occurrence or event shall be admisssible in evidence in all trials, hearings and proceedings in any cause or suit in any court, or before any officer, arbitrators, or referees, in proof of said act, transaction, occurrence or event if it was made in the

regular course of any business and it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record including lack of personal knowledge by the entrant or maker, may be shown to affect its weight but not its admissibility."

A record made in the regular course of business showing the hours worked on a particular day would seem to be a prime example of the business entry exception to the hearsay rule. In *Siewek v F Joseph Lamb Co*, 257 Mich 670; 241 NW 807 (1932), books were held to be admissible to show the amount of time put in by men on a construction job. In that case the entries were taken from the original time cards. In the instant case defendant sought to introduce the time card itself, which would seem to be even more reliable than book entries taken from such a card.

Furthermore, the evidence was highly relevant. Plaintiff had testified that following his injury he was unable to complete his shift. The time card would suggest that if plaintiff was able to complete his shift and put in overtime any injury was much less severe than plaintiff contended. While the determination of relevance is within the sound discretion of the trial court, *People v Miller*, 78 Mich App 336; 259 NW2d 877 (1977), in the instant case we find the court abused that discretion.

### VI. Adverse inferences

In giving the charge to the jury the trial court indicated that an adverse inference could be drawn from the failure of defendant to record the event of plaintiff's injury in the engine room log.

There was no factual basis for this instruction. Chief Engineer Crane specifically testified that no such entry would be made. Plaintiff relies upon the testimony of Captain Molnar. Captain Molnar testified that he filled out a report of injury or sickness form. He also stated that the normal practice was to have someone in the engine department fill out this form. However, there was no testimony to indicate that an entry would be made in the engine room log. Giving an instruction unsupported by proof is error. See *Embrey v Weissman,* 74 Mich App 138; 253 NW2d 687 (1977).

The trial court also instructed the jury that they could draw an adverse inference from defendant's failure to produce records concerning the coal purchased for use aboard the vessel.

James DeWitt, the manager of defendant's Cleveland office, testified that he had records of the amount of fuel taken on board the ship and the type of fuel, *i.e.,* stoker coal. There was no record kept of the quality of coal received.

The amount or type of fuel was irrelevant to the determination of liability. Giving an adverse inference instruction when the records were of no relevance was prejudicial to defendant.

Finally, the trial court instructed the jury that they could draw an inference adverse to defendant from the failure to produce film taken by Mr. Whitehead, defendant's investigator.

Mr. Whitehead testified that he filmed plaintiff walking without crutches, using only a cane, on November 18, 1976, between 5:26 p.m. and 5:41 p.m. The investigator testified that he discarded the film without developing it because of the poor lighting conditions.

When plaintiff testified in rebuttal he admitted

using only a cane on that day. The doctor whom plaintiff went to see that day confirmed that plaintiff was using a cane.

In view of the date and time it is completely reasonable that there was insufficient lighting to make developing the film worthwhile. Moreover, since plaintiff admitted using a cane on that day and the doctor confirmed this fact, we find it was error to give the instruction.

### VII. Inflation

Defendant's final argument is that the trial court erred in refusing to charge the jury that it should disregard inflation in making any award for loss of future earnings. We find no error.

In cases such as the instant one the entire proceedings, including the measure of damages, are governed by principles of maritime law. *Petition of United States Steel Corp,* 436 F2d 1256, 1278 (CA 6, 1970). Accordingly, damages must be reduced to present value, as the trial court instructed in the instant case. *Id.,* at 1280. However, the trial court did not err in refusing to give the proposed instruction. See *Bach v Penn Central Transportation Co,* 502 F2d 1117, 1122 (CA 6, 1974).

### VIII.

Plaintiff cross-appeals raising one issue for our consideration. It is plaintiff's contention that interest should have been awarded from the date of filing the complaint pursuant to MCL 600.6013; MSA 27A.6013. The trial court rejected this claim and awarded interest from the date of judgment.

The trial court was correct in denying prejudgment interest. The Jones Act incorporates the

Federal Employers' Liability Act. *Garrett v Moore-McCormack Co Inc,* 317 US 239, 244-245; 63 S Ct 246; 87 L Ed 2d 239 (1942). The allowance of interest on such judgments is a matter of Federal substantive law. *Louisiana & A R Co v Pratt,* 142 F2d 847 (CA 5, 1944). See also *Hanley v Erie R Co,* 81 NYS2d 100 (1948).

Defendant's other claims of error are without merit and do not need discussion.

Reversed and remanded for a new trial. Costs to appellant.